924 So.2d 207 (2005)
FREEPORT-McMORAN, INC. and FM Properties Operating Company
v.
TRANSCONTINENTAL GAS PIPE LINE CORPORATION and Transco Energy Company.
No. 2004 CA 0031.
Court of Appeal of Louisiana, First Circuit.
October 14, 2005.
*209 John M. Wilson, Jonathan A. Hunter, Brian A. Jackson, Jana L. Grauberger, New Orleans, Counsel for Plaintiff/Appellant IMC Global, Inc., as successor of Freeport-McMoran, Inc. and FM Properties Operating Company.
Leo C. Hamilton, Jude C. Bursavich, Baton Rouge, Timothy J. Herman, Matthew R. Beatty, Austin, TX, Counsel for Defendant/Appellee Transcontinental Gas Pipe Line Corporation and Transco Energy Company.
Before: GUIDRY, GAIDRY, and McCLENDON, JJ.
GAIDRY, J.
This appeal involves the interpretation of "excess royalty" provisions in two settlement agreements entered into by a natural gas producer and a purchaser. For the following reasons, we affirm the judgment of the trial court.

FACTS AND PROCEDURAL HISTORY
Plaintiffs, Freeport-McMoran, Inc. and FM Properties Operating Co. (collectively "Freeport") leased offshore land from the Department of the Interior, Minerals Management Service ("MMS"). Under this lease, Freeport owed the MMS royalty payments on all natural gas produced from the leased property. Freeport had numerous gas purchase agreements with defendant, Transcontinental Gas Pipe Line Corporation and Transco Energy Company (collectively "Transco"), some of which involved gas produced from the MMS leases. These gas purchase contracts were typically long-term purchase agreements, which called for high prices and required the purchaser to take large volumes of gas. The contracts generally contained "take-or-pay" provisions, which required the pipeline to either take the required volume of gas under the contract, or pay for a minimum amount of gas. During the 1980's when the market value of the gas dropped below the prices called for in many of these contracts, the terms of the gas purchase agreements became burdensome to Transco, and settlement agreements were negotiated. The settlement agreements, specifically the 1986 PLC Omnibus Settlement[1] and the 1989 Master Settlement Agreement, allowed Transco to purchase lesser amounts of gas at lower prices. In consideration for these less onerous purchase requirements, Transco agreed to make several payments to Freeport. The settlement agreements also contained "excess royalty" provisions, wherein Transco agreed to reimburse Freeport for excess royalty payments it became obligated to pay.
The "excess royalty" provision in the PLC Omnibus Settlement stated:
Transco agrees to reimburse [Freeport] for all "excess royalty payments", which [Freeport] is required to pay to any royalty owner (but not to any overriding royalty owner) which excess royalty payment is (a) directly related to the lump sum payment provided for hereinabove and/or (b) based upon the price that [Freeport] would have received under the provisions of the Subject Contracts prior to being amended by the provisions set forth on Exhibit "D". In the event demand is made on [Freeport] for the settlement of royalty payments on the basis set forth hereinabove, [Freeport] shall promptly notify Transco of *210 such demand. Notwithstanding the foregoing, Transco's obligation to reimburse [Freeport] for "excess royalty payments" hereunder shall be subject to the following conditions precedent:
i) [Freeport] must demonstrate that it has paid its royalty owners their royalty share of the lump sum payment made by Transco under this Agreement; and
ii) [Freeport] must contest the validity of any royalty owner's demand by all reasonable means and, to the extent permitted by law, must cooperate with Transco to permit its participation in the defense of any such claim against [Freeport], including the right to file briefs or motions, present arguments and offer or cross-examine witnesses, make investigations and approve any settlement of the claim as Transco deems expedient.
In the Master Settlement Agreement, Transco agreed to make two types of payments to Freeport: a lump sum payment of $25.4 million and a "Premium Sum" payment of $17.9 million, which would be paid over several years. The "excess royalty" provision in the Master Settlement Agreement provided:
4. EXCESS ROYALTY
(a) Subject to the conditions set out below in this Paragraph 4, Transco hereby obligates itself to pay any additional royalty ("Excess Royalties") which may be paid or required to be paid to any royalty owner under the leases subject to the [Freeport] Contracts and the [Freeport] Replacement Contracts (exclusive of any overriding royalty owners acquiring such interests subsequent to November 30, 1988) because of the reduced prices paid or to be paid for natural gas as the result of the execution of this Agreement and the [Freeport] Replacement Contracts or as the result of reduced prices paid pursuant to any prior relevant settlement agreement including, without limitation, the Omnibus Settlement Agreement. The obligation to pay Excess Royalties shall not obligate Transco to pay additional royalty claimed or paid on the [$25.4 million lump sum payment].
An amendment to the Master Settlement Agreement ("Master Settlement Amendment") was executed on January 2, 1992, in which Transco agreed to pay Freeport the Premium Sum in three installments, ratified the obligation to pay the Premium Sum, and ratified Transco's excess royalty obligation under the Master Settlement Agreement.
After an audit by the MMS, Freeport and the MMS negotiated and subsequently entered into a compromise and settlement concerning the MMS's claims that Freeport owed them royalties on the money received under the gas contract settlements. The terms of the settlement required Freeport to pay the MMS a lump sum. Freeport then sought reimbursement from Transco, asserting that the lump sum payment to the MMS constituted excess royalties.[2] Transco refused to reimburse Freeport, and Freeport filed this lawsuit in 1995.
In 1998, the trial court granted a partial summary judgment in favor of Freeport on liability, holding that the excess royalty provisions unambiguously required Transco *211 to reimburse Freeport for Freeport's payments to the MMS. This partial summary judgment left only the issue of quantum for trial. Transco appealed the partial summary judgment, and this court held that Freeport had not sustained its burden of proving that the settlement agreements at issue were clear and unambiguous and that Transco was liable as a matter of law, and remanded the matter for trial based upon its findings that: (1) the amended contracts include neither a definition of "excess royalties," nor an explanation of how or if "royalty" and "excess royalties" differ; (2) the affidavits and attachments contained no evidence to show the meaning of the term "excess royalties" as a term of art with accepted usage in the industry; and (3) the evidence submitted did not establish how Freeport's payment to MMS was classified or whether all or only a part of the payment was excess royalty. Freeport-McMoran Inc. v. Transcontinental Gas Pipeline Corp., 99-0420 (La.App. 1 Cir. 3/31/00) (unpublished opinion).
A bench trial was held on July 8-11, 2003, at which the central issue was the intended meaning of the excess royalty provisions contained in both the Master Settlement Agreement and the PLC Omnibus Settlement. Additionally at issue was the quantum of damages owed to Freeport, including principal, interest, and attorney fees. After trial, the court ruled in favor of Transco and denied Freeport's claim for reimbursement of excess royalty under both the PLC Omnibus Settlement and the Master Settlement Agreement. A judgment to this effect was signed on August 12, 2003, and Freeport filed this appeal, assigning the following errors:
1. The trial court erred in rendering judgment against Freeport where only Freeport presented evidence of custom and usage in the industry of the term "excess royalties," and the evidence presented was uniformly in Freeport's favor.
2. The trial court's decision concerning the Master Settlement Agreement is clearly wrong based upon the evidence presented by the principal negotiators of the contract for Freeport, especially where Transco could have, but did not present any of its principal negotiators as witnesses.
3. The trial court erred in rendering judgment against Freeport concerning the PLC Omnibus Settlement because no evidence of intent was introduced by the parties and Louisiana Civil Code article 2056 requires that the contract be interpreted against Transco because Transco drafted the contract.
4. The trial court erred in excluding a substantial portion of the testimony of Freeport's expert witness, Kris Terry, which prevented Freeport from presenting significant evidence concerning liability and damages.
5. The trial court misinterpreted and misapplied Louisiana Civil Code article 2053 in basing its decision on clearly irrelevant evidence and testimony concerning performance in other, unrelated contracts involving third parties.
6. The trial court erred in rendering judgment against Freeport under circumstances where the contractual interpretation urged by Transco renders the contractual provisions at issue meaningless, in violation of Louisiana Civil Code article 2049.

DISCUSSION
The primary issue in this case is contractual interpretation. The First Circuit in Spohrer v. Spohrer, 610 So.2d 849, 851-53 *212 (La.App. 1 Cir.1992), held the following regarding interpretation of contractual provisions:
Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. . . . When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. The rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit.
As a general rule, parol evidence is inadmissible to vary, modify, explain, or contradict a writing. In Investors Associates Ltd. v. B.F. Trappey's Sons, Inc., 500 So.2d 909, 912 (La.App. 3rd Cir.), writ denied, 502 So.2d 116 (La.1987), the court noted that:
[C]ontracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement.
However, as pointed out by the court in Investors Associates, Ltd., there are exceptions which permit reference to parol and other outside evidence. When the terms of a written contract are susceptible of more than one meaning, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity, show the intention of the parties, or prove fraud. Where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the party's own conclusions rather than adhere to a forced meaning of the terms used.
[Louisiana Civil Code article] 2045 defines interpretation of a contract as "the determination of the common intent of the parties." Such intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Moreover, [Louisiana Civil Code article] 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." The rule of strict construction does not authorize perversion of language or the creation of ambiguity where none exists and does not authorize courts to make a new contract where the language employed expresses the true intent of the parties. One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for a period of many years. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances.
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text and/or against the obligee and in favor of the obligor of a particular obligation.
*213 The applicable standard of review for contractual interpretation was set forth by this court in Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924, 928 (1989): (Citations omitted).
Whether a contract is ambiguous or not is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. (Citations omitted).
Thus, the threshold issue in this matter is whether the terms of the contract are explicit or ambiguous. If the language of the contractual provisions is determined to be explicit and unambiguous, no additional evidence may be considered.
In the instant case, this court found in a prior appeal that the contract terms were not clear and unambiguous. Thus, the trial court had to look beyond the four corners of the document at trial to determine the intent of the parties as to the ambiguous provisions. The court's findings regarding the intent of the parties are subject to the manifest error standard on review.
At the trial of this matter, the following evidence was presented regarding the intent of the excess royalty clauses:
Patrick Martin was called as an expert witness by Freeport to testify as to custom and usage in the oil and gas industry as it relates to pipeline-producer agreements and royalty issues. Mr. Martin testified that the meaning of "excess royalty" in the oil and gas industry has changed over the years. In the 1970's, during the market value controversy in which the market value of gas was higher than the price contained in the gas purchase contracts between the producers and the pipelines, producers feared that their royalty owners would claim royalty based upon the higher market value of the gas rather than the contract price. As a result, pipelines began agreeing to excess royalty clauses which provided that if the producer became obligated to pay royalty to its lessor based upon the higher market value, the pipeline would pay that "excess royalty," i.e., the difference between the royalty on the contract price and the royalty on the market price. The Federal Energy Regulatory Commission ("FERC") allowed the pipelines to pass these excess royalty costs on to their customers. During the gas contract settlements in the 1980's, the "excess royalty" terminology was used again because the parties were trying to serve something of the same function. If producers received a payment as consideration for lowering the long-term contract price, it was uncertain whether the royalty owner would be able to successfully claim a portion of the lump sum payment received as consideration for the renegotiated contract terms. Mr. Martin testified that producers wanted to protect their settlement, so they included provisions in their settlements requiring the pipeline to pick up royalty that might be owed to the royalty owner on either the lump sum payment or based on the lower price, and the pipeline could then pass this cost on to its customers. However, Mr. Martin was not aware of any specific instance in which a pipeline reimbursed a producer for royalty payments to the MMS related to a lump sum. Mr. Martin testified on cross-examination that although excess royalty clauses were common in the industry at the time, *214 they vary in their terms and conditions and there is no standard form excess royalty clause.
Kris Terry testified as an expert witness on behalf of Freeport in the areas of producer-pipeline natural gas contracts and gas contract settlements. Ms. Terry testified that pipelines typically tried to accomplish two things in gas contract settlements: they needed a reduced obligation to purchase gas (reduced take-or-pay quantities), and they needed to reduce the prices paid under the contracts. Producers needed to sell gas, even if it was for a lower price, since they had a lot of money already invested in drilling wells, and as a result, they generally agreed to restructure their existing contracts. By the time the parties were in settlement negotiations, they generally had to address both past liabilities, i.e., the pipeline's failure to perform under the take-or-pay provisions of their contract; and how to proceed in the future, i.e., whether the gas would still be committed to the pipeline in the future or permanently released from the contract and sold to someone else. Typically pipelines used lump sum cash payments to compensate producers for the lost value associated with the unfulfilled contracts. Due to the uncertainty as to whether the MMS could claim royalty on the settlement proceeds, some producers and pipelines included special royalty provisions in their settlement agreements apportioning the risk of future royalty liability. Ms. Terry testified that she had reviewed both the PLC Omnibus Settlement and the Master Settlement Agreement, and that both were very typical of the type of settlement agreements being entered into by producers and pipelines during that timeframe.
John Amato, an attorney and one of Freeport's principal negotiators of the Master Settlement Agreement, testified that at the time the Master Settlement Agreement was entered into, Freeport's understanding as to whether the payment received as consideration for the settlement agreements would be royalty-bearing to the MMS was uncertain at best. To deal with this uncertainty, the parties inserted an excess royalty clause in the Master Settlement Agreement. Freeport wanted Transco to assume the royalty risk, which Transco did not want to do, and Transco wanted to be released from the burdensome terms of its gas purchase contracts. The parties reached a compromise wherein Freeport took the royalty risk on the lump sum payment and Transco took the risk on the Premium Sum.
Charles Jeanfreau, a landman for Freeport at the time of the negotiation of the Master Settlement Agreement, testified that his understanding at the time of the 1988 negotiations of the effect of the excess royalty clause was that if the MMS required Freeport to pay any royalties as a result of the reduction in price agreed to in the replacement contracts, Transco would be obligated to pay that amount, except insofar as the claim was related to the twenty-five million dollar lump sum payment. Mr. Jeanfreau said that Freeport paid the MMS royalties on the proceeds of gas produced under the amended contracts as it was sold, but did not inform the MMS of the money received as consideration for the reduction in price under the Master Settlement Agreement. Mr. Jeanfreau testified that at the time that the negotiations concerning the Master Settlement Amendment were ongoing, the MMS had already made a preliminary analysis of the Master Settlement Agreement, so Freeport was aware that it was possible that the MMS would assert a royalty claim on some of the money involved in the settlement and requested indemnification from Transco and tried to "juice up" the excess royalty provision to include the Premium *215 Sum. Transco refused. Thereafter, Mr. Jeanfreau suggested in an interoffice memo that Freeport should attempt to enter into a global settlement with the MMS, but made no mention in this memo of Transco's obligation to reimburse Freeport for the royalties. Mr. Jeanfreau's negotiations with the MMS lasted a couple of years, and in 1992 Jeanfreau sent a letter to Randy Conklin, an attorney at Transco, informing him of the negotiations and inviting Transco to join in the negotiations, and stating that Freeport expected Transco to pay any excess royalties that were involved. No one from Transco ever responded to the offer, and Mr. Jeanfreau proceeded with the negotiations and eventually reached a settlement with the MMS. Right before the settlement was reached, Mr. Jeanfreau sent another letter to Transco, telling them that he believed settlement to be imminent, but again no response was received.
The Freeport-MMS settlement agreement, dated November 8, 1994, calls for Freeport to pay a lump sum of $12,850,000.00 to the MMS, in addition to the royalty payments Freeport was making on a monthly basis for gas produced and sold under the replacement contracts. The settlement with the MMS covered several contracts, both offshore and onshore, which did not all involve Transco. A document prepared by the MMS auditor explains the MMS's position on how the lump sum paid under the MMS settlement was to be allocated. Mr. Jeanfreau admitted that he asked the MMS auditor not to send portions of that document to Transco's attorney in the instant suit because he felt that the document did not accurately represent the deal that Freeport and the MMS had made. In addition to showing the MMS's allocation of the lump sum payment, the fax from the MMS auditor also states the following about Freeport's gas contract settlement agreements:
The intent of the excess royalty clause is to assure the producer that it will not become liable for royalties because MMS dictates a gas price for royalty purposes that exceeds the price agreed to in the settlement agreement. The application of the excess royalty clause is distinct and separate from the gas contract disputes that are settled and the consideration used for that purpose.
On cross-examination, Mr. Jeanfreau admitted that he was not familiar with any situation wherein an excess royalty provision in an offshore gas settlement contract had covered base royalty on a lump sum payment.
A December 1996 letter from the MMS to Mr. Jeanfreau outlined the MMS's position on royalties arising out of gas contract settlements. According to the letter, the MMS did not pursue royalties on the basis of whether a lessee has been diligent in enforcing its contracts. If the contracts were amended, and no additional compensation was paid by the purchaser, the new, rather than the old, contract price would form the basis of the value for royalty purposes. Furthermore, the MMS only sought royalty on money paid in settlement if the payment accrued to production. Thus, if money was paid as compensation for a reduction in the per unit price of production in the future, that payment would be royalty-bearing when that production occurred; on the other hand, if money was paid as compensation for a reduction in production, then that payment is not accruing to production in the future, and no royalty is owed.
Ollie Brown, another of Freeport's principal negotiators, testified that there was a difference between royalty and excess royalty, and went on to say "[Freeport] obviously [was] prepared at all times to pay royalties on monies that we received . . . *216 [a]nd payment for gas delivered. To the extent that there would be anything above that, excess over and above that . . . I would define that as excess royalties." Mr. Brown testified at his first deposition that the Premium Sum resulted from reduced prices paid pursuant to the PLC Omnibus Settlement; however, he testified in a later deposition that he had been mistaken, and the Premium Sum did not result from reduced prices paid under a prior settlement.
David Glenn, Transco's attorney involved in the negotiation and drafting of the 1986 PLC Omnibus Settlement, testified as to his recollection of the drafting of the excess royalty clause in that agreement:
This clause was drafted to address producers' requests as part of the negotiation of the settlement for some indemnity for excess royalty payments. To the extent that a royalty owner claimed that the settlement payment that was received for the renegotiation or buydown of the contract was not sufficient, or that the . . . renegotiated price as a result of [the settlement payment] was insufficient, and then made a claim for additional royalty or excess royalty above the settlement payment that was made by Transco or the price that was received under the amended contract.
Although the excess royalty clause was drafted by Transco, changes were made at Petro Lewis's request. Mr. Glenn believed that Petro Lewis's representatives understood Transco's intention concerning the meaning of the excess royalty clause, which was that Transco would only reimburse Petro Lewis for royalty paid on money that Petro Lewis never received. When asked about subsection (i) of the PLC Omnibus Settlement, which required that "[Freeport] must demonstrate that it has paid its royalty owners their royalty share of the lump sum payment made by Transco under this Agreement," Mr. Glenn explained that this evidenced the parties' understanding that Freeport would first have to pay its royalty owner its royalty share on the lump sum payment received under the settlement before Transco would become obligated to pay any royalty demanded by the royalty owner in excess of that amount.
Quentin Gensler, a principal negotiator for Transco on the PLC Omnibus Settlement, prepared a document on June 2, 1986, entitled "Petro Lewis Omnibus, Management Decisions Required," which described the requests made by Petro Lewis during the negotiations and Transco's response or Mr. Gensler's recommendation to Transco's management. One item stated that Petro Lewis had requested a "reallocation of the monies so as to minimize royalty payments on the buy down." Mr. Gensler's recommendation was that Transco would try to accommodate them to the extent possible. Additionally, in a memo drafted approximately two weeks after the PLC Omnibus Settlement was signed, Mr. Gensler explained the agreement's excess royalty clause to the parties at Transco who would be administering the contract. According to this memo, Transco would be responsible for claims for royalty payments that were based on an amount in excess of the lump sum payment or based on the old prices, subject to Petro Lewis demonstrating that it had paid its royalty owners their royalty share of the lump sum payment and contesting all such claims by all reasonable means. Mr. Gensler testified that in drafting the excess royalty clause, he in no way intended for that provision to require Transco to reimburse Petro Lewis for its base royalty on the lump sum payment. Furthermore, of the hundreds of settlement agreements containing excess royalty clauses which *217 Mr. Gensler negotiated on behalf of Transco in the mid-to-late 1980's, he knew of no other producer who had ever came back to Transco asking to be reimbursed for base royalty paid to the MMS on a lump sum payment. When asked why the PLC Omnibus Settlement did not include "excess royalty" in its "Definitions" section, Mr. Gensler stated that the parties never discussed the definition of "excess royalty" during the negotiations because he believed their understanding of the term to be the same.
Fred Hosey, an attorney for Harkins and Company, an oil and gas exploration, drilling, and production company, was involved in the renegotiation of Harkins and Company's gas contracts with Transco in 1986. The contract which was the subject of the renegotiation was the Greens Creek Field in Jefferson Davis County, Mississippi. Harkins and Company had several working interest partners in the Greens Creek Field, including Petro Lewis. Each of the working interest owners settled their gas contract disputes with Transco separately, and after the settlements were reached, a meeting took place on June 27, 1986, among all of the working interest owners on that field to discuss how they would distribute royalty to the royalty owners and overriding royalty owners of the Greens Creek Field. The representatives of the various working interest owners present at the meeting discussed the possibility that they might not be legally obligated to pay the royalty owners, but proceeded to discuss the logistics of making the royalty payments. It was discussed that in order to keep from being sued by the royalty owners, they needed to distribute to the royalty owners their share of the settlement proceeds, and the representatives agreed to each contribute their proportionate share of the royalty burden out of their respective settlement proceeds. Mr. Hosey testified that during this discussion, the Petro Lewis representative never mentioned that Transco, not Petro Lewis, was responsible for royalties owed under the settlement. Furthermore, a letter drafted with the cooperation of the working interest owners was sent to the Greens Creek Field royalty owners which stated: "These settlements, arrived at through independent negotiations, resulted in the lump sum cash settlements to the various Contract Settlers, which were accepted with the understanding that both the Contract Sellers and their royalty owners would participate in the funds collected." Although Mr. Hosey could not remember whether it was Petro Lewis or another of the working interest owners who suggested this particular language, Petro Lewis did not object to the language or mention that Transco was in fact the responsible party. Mr. Hosey testified that the language of the excess royalty clauses in Harkins and Company's settlement agreement with Transco on the Greens Creek Field, Petro Lewis's agreement with Transco on the Greens Creek Field, and the PLC Omnibus Agreement were all the same. David Glenn confirmed Mr. Hosey's testimony that the negotiation and execution of the two 1986 settlement agreements between Petro Lewis and Transco (the Greens Creek Field Settlement and the PLC Omnibus Settlement) took place at the same time, involved the same negotiators, and contained the same excess royalty clauses.
Jay Elston, an attorney for Transco at the time of the settlement agreements, testified that there was a distinct difference between the terms "royalty" and "excess royalty." The term "royalty" had been in the industry forever, and simply referred to the landowner's share of the mineral. The term "excess royalty," however, did not come along until the radical fluctuations in the market in the 1970's *218 and 1980's. Out of the hundreds of settlement agreements Transco entered into with producers, Mr. Elston testified that he did not know of a single one wherein Transco agreed to reimburse a producer for his royalty obligation under the lease, i.e., royalty on the money he actually received.
Richard Adkerson, the president and CFO of Freeport-McMoran Copper & Gold, Inc. and the co-chairman and CEO of McMoran Exploration, negotiated the Master Settlement Amendment on behalf of Freeport. He had not been involved in the previous settlements, but became involved in the amendment because he had a long-time working relationship with Larry Dagley, Transco's chief negotiator. He testified that he was not sure what the term "excess royalty" meant or what the difference was between "royalty" and "excess royalty," but that he had been informed prior to negotiating that Freeport had royalty protection in their existing agreements and that he should continue to insist on it in any future agreements. Mr. Adkerson told Mr. Dagley during the negotiations that Freeport wanted royalty indemnification in the Master Settlement Amendment.
Charles Holmes, an attorney for Petro Lewis, testified that his recollection of the 1986 negotiations was that for any settlement that would or could be royalty-bearing, the pipeline had to be responsible for royalty or Petro Lewis would not sign the agreement. His understanding of the difference between "royalty" and "excess royalty" was that "royalty" was a payment that was usually expressed fractionally or as a portion of the proceeds received in payment for gas that has been captured, or that will be captured, pursuant to the lease, and "excess royalty" was whatever exceeded that.
Steve Rector participated in the PLC Omnibus Settlement negotiations on behalf of Petro Lewis. He testified that he had no recollection of what was actually intended by the excess royalty clause contained in the PLC Omnibus Settlement, but when the term "excess royalty" was used in a contract without definition, he would consider it to mean that amount above and beyond one-sixth of the money actually received.
Several proposed versions of the Master Settlement Agreement's excess royalty clause drafted by the parties during negotiations were introduced into evidence at the trial of this matter. A November 22, 1988 draft prepared by Freeport attorney John McCollam stated that:
[E]xcess royalty payments shall mean royalty, overriding royalty and net profit overriding royalty payments or other burdens paid or required to be paid by [Freeport] to any or all of the Royalty Owners . . . with respect to gas produced and sold . . . to the extent that such payments are deemed to be owed based upon the Master Settlement Agreement and/or the difference in the price. . . .
A December 21, 1988 draft prepared by Freeport obligated Transco to pay:
. . . any additional royalty ("Excess Royalties") which may be paid or required to be paid to any royalty owner under the leases subject to the [Freeport] Contracts, the [Freeport] Replacement Contracts and the Premium Contracts as the result of reduced prices paid or to be paid for natural gas . . . . The obligation to pay Excess Royalties shall not obligate Transco to pay additional royalty claimed or paid on the [$25 million lump sum payment].
In a December 28, 1988 draft prepared by Freeport, the excess royalty language remained unchanged from the December *219 21 draft. Although these drafts included the premium contracts in the excess royalty provision, Mr. Jeanfreau testified that this was a mistake and the premium contracts should not have been included in the excess royalty clause because the premium contracts were simply contracts based on which Freeport could collect the Premium Sum as payments for gas, so there was no reduction of price.
A January 10, 1989 Transco draft of proposed excess royalty language stated:
Transco agrees to reimburse [Freeport] for all excess royalty payments which [Freeport] is required to pay to any royalty owner (but not to any overriding royalty owner) which are claimed based upon the difference in the price that [Freeport] would have received under the [Freeport] Contracts prior to the execution of this Agreement and/or any other relevant settlement agreements. . . . Notwithstanding the foregoing, Transco's obligation to reimburse [Freeport] for excess royalty payments hereunder shall be limited to those amounts in excess of the applicable royalty owner's share of the [$25 million lump sum payment and $17 million premium payment].
Handwritten notes on Transco's copy of the draft point out that the premium contracts should not have excess royalty because Transco was paying more than the contract price for that gas.
Transco also introduced a July 29, 1988 "Amendment to Unit Operating Agreement" entered into by Freeport and TXP Operating Company, Transco's production affiliate, in which "excess royalty" was defined as royalties reserved to the lessor in excess of a sixth of six-sixths. This agreement was filed with the MMS, and a copy was furnished to TXP. Mr. Jeanfreau acknowledged that he drafted this excess royalty clause in approximately the same time frame as the Master Settlement Agreement, but stated that "excess royalty" under an operating agreement had a very different meaning from "excess royalty" under a gas contract settlement.
Transco introduced a Freeport internal memorandum assigning tasks to the various departments in connection with the Master Settlement Agreement, which stated that the Legal and Land Departments would attempt to obtain agreement with the MMS for payment of royalties on premium sums received, but did not mention that the responsibility for payment of the royalty on the Premium Sum would be Transco's, not Freeport's. However, Mr. Jeanfreau testified that before Freeport could attempt to collect reimbursement from Transco, Freeport had to pay the royalty to the MMS.
The Manual of Oil and Gas Terms  Eleventh Edition, of which Mr. Martin is the co-editor for updates, defines "excess royalty" as "a term occasionally used to describe a royalty in excess of the usual one-eighth royalty or to describe an overriding royalty." "Excess royalty clause" is defined in the manual as "a provision found in some settlement agreements and releases accompanying a compromise of disputes between pipelines and producers over a take-or-pay clause whereby the burden of making certain royalty payments is shifted from the producer to the pipeline."

Assignment of Error Number 1
Freeport also argues on appeal that since it alone presented evidence of custom and usage in the industry to determine the meaning of "excess royalties," and this evidence was uniformly in Freeport's favor, the trial court erred in rendering judgment against Freeport.
Since the language of the excess royalty clauses is not clear and unambiguous, Louisiana Civil Code article 2053 provides that *220 it must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. While it is true that the only expert testimony concerning the custom and usage in the industry of the term "excess royalty" was Mr. Martin's, and that his testimony seemed to favor Freeport's interpretation of the clause, the trial court was free to accept or reject Mr. Martin's opinion. Additionally, custom and usage in the industry are not the only factors to be considered in interpreting an ambiguous contractual provision. Evidence was also presented regarding the nature of the contract, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. We cannot say that the trial court committed manifest error in failing to render judgment in favor of Freeport based upon Mr. Martin's testimony as to custom and usage alone.

Assignment of Error Number 2
Freeport alleges that the trial court's denial of its claim arising out of the Master Settlement Agreement was clearly wrong based upon the evidence presented by the principal negotiators of the contract for Freeport, especially where Transco could have, but did not present any of its principal negotiators as witnesses. Freeport put on the testimony of principal negotiators Amato, Jeanfreau, and Brown at trial. However, in his ruling, the trial court stated that he did not find Mr. Amato to be a very credible witness, nor did he find Mr. Brown to be a very credible or trustworthy witness.
When a court's factual findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier-of-fact's findings; for only the fact finder can be aware of the variations in demeanor and tone that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The testimony of Freeport's remaining principal negotiator, Mr. Jeanfreau, regarding his understanding at the time of the 1988 negotiations of the effect of the excess royalty clause did not support Freeport's assertion that the excess royalty was meant to cover base royalty on the settlement payments. Additionally, as noted above, the testimony of the parties involved as to the intent of the provision is not the only factor to be considered in interpreting an ambiguous contractual provision. We find no manifest error in the trial court's failure to rule in favor of Freeport based on this assignment of error.

Assignment of Error Number 3
In this assignment of error, Freeport alleges that the trial court erred in rendering judgment against Freeport concerning the PLC Omnibus Settlement because no evidence of intent was introduced by the parties, and Louisiana Civil Code Article 2056 requires that the contract be interpreted against Transco because Transco drafted the contract.
Louisiana Civil Code article 2056 provides that where there is doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.
Freeport's argument is flawed in two respects. First, evidence of the parties' intent in drafting this clause was presented at trial. Mr. Glenn, the Transco attorney who was involved in the drafting and negotiation of the PLC Omnibus Settlement, testified as to the intent behind the excess royalty clause, which was that the *221 excess royalty clause was meant to address Freeport's request for some indemnity from claims by royalty owners for additional royalty or excess royalty above the lump sum settlement payment or above the renegotiated price. Furthermore, documents created by Mr. Gensler, one of Transco's principal negotiators, provided further evidence of the parties' intent. Mr. Gensler's "Management Decisions Required" memo, which documented the negotiation process, noted that Petro Lewis had asked to have the lump sum payment offset by money they owed to Transco so as to reduce the royalty payments on the buy down. This contradicts Petro Lewis's assertion that the intent was for Transco to pay the royalty attributable to the buy down portion of the lump sum payment; there was no reason for Petro Lewis to bargain to reduce the royalty that would be payable by Transco. Also, Mr. Gensler's memo written shortly after the PLC Omnibus Settlement was signed mirrored Transco's current assertions as to the intent behind the clause. Mr. Gensler testified that he in no way intended for that provision to require Transco to reimburse Petro Lewis for its base royalty on the lump sum payment.
Furthermore, testimony at trial regarding the drafting of the PLC Omnibus Settlement was that the clause was primarily drafted by Mr. Glenn, but that modifications were made at Petro Lewis's request.

Assignment of Error Number 4
Freeport next alleges that the trial court improperly excluded the bulk of the testimony of its expert witness, Ms. Terry, and in doing so, prevented Freeport from presenting significant evidence relating to liability and damages. Freeport designated Ms. Terry as an expert to testify about "industry/MMS negotiation and resolution of royalty claims on gas contract settlement proceeds and other regulatory matters" in its July 2001 answers to interrogatories. On August 24, 2001, Transco filed a motion to exclude the testimony of Ms. Terry. In the motion, Transco argued that when Ms. Terry was deposed on August 14, 2001, she greatly expanded the subject matter and scope of her testimony beyond the designation set forth in Freeport's answers to interrogatories. Thus, Transco asked that the portions of Ms. Terry's testimony which exceeded the scope of her designation be stricken. Additionally, Transco argued that any testimony by Ms. Terry regarding trade usage or custom associated with the term "excess royalties" should be excluded as such testimony was not reliable. Finally, Transco sought to have the trial court exclude any testimony by Ms. Terry as to the basis of claims made by the MMS in its audit of Freeport, or the basis of claims paid by Freeport, as her testimony was irrelevant and constituted factual evidence which she was not qualified to give.
In a June 17, 2003 Pretrial Order, Freeport designated Kris Terry as an expert witness to testify concerning "industry/MMS negotiation and resolution of royalty claims on gas contract settlement proceeds (including the settlement proceeds at issue here) and other regulatory matters." However, when Ms. Terry was called to testify on July 10, 2003, Freeport's tender was broader than the scope of her testimony as outlined in both the 2001 answer to interrogatories and the June 17 Pretrial Order. Freeport tendered her as an expert in natural gas contracts and gas contract settlements between producers and pipelines and in resolution of MMS royalty claims arising from producer-pipeline gas contract settlements. Additionally, Freeport advised the court that it intended to ask Ms. Terry to testify about custom and usage in the industry regarding gas contracts and the industry's dealings with *222 the MMS over gas contract issues, as well as to assist the court in allocating the dollars that Freeport paid to the MMS and explaining that allocation so that the court could determine the dollar amounts subject to Freeport's excess royalty claim.
Transco objected to the proposed testimony by Ms. Terry for the same reasons outlined in its previous motion to exclude her testimony. When questioned by the court about her experience in the area of resolution of MMS royalty claims arising from producer-pipeline gas contract settlements, Ms. Terry testified that she had been involved on behalf of three clients in resolving gas contract settlement issues with the MMS. She testified she gathered backup data for the MMS on the producer's claims against the pipeline and explained the producer's position to the MMS on how the settlement proceeds should be allocated.
The court accepted Ms. Terry as an expert in the area of producer-pipeline natural gas contracts and gas contract settlements, but denied the remainder of the request. Freeport proffered Ms. Terry's expected testimony and exhibits in the areas she was not allowed to testify.
Freeport contends that Ms. Terry has specialized knowledge related to MMS's collection of additional royalties on gas contract settlements between producers and pipelines, and that she would have testified as to the allocation made by MMS as to what portions of the settlement dollars paid pursuant to the PLC Omnibus Settlement and the Master Settlement Agreement would have been considered royalty-bearing to the MMS.
Louisiana Code of Evidence article 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Louisiana courts have adopted the standards set forth by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993), which regulate the admission of "scientific" testimony. In that case, the Supreme Court stated that the gatekeeping function of the trial court requires it to assess, among other things, the "reliability" of the methodology or formulation upon which the expert's opinion is based. The reliability of a non-scientist expert's testimony, when it is not formulated on scientific research, is still judged using the Daubert standard. The Supreme Court has recognized such in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). Thus, the trial court's gatekeeping obligation also applies to testimony based on "technical" and "other specialized" knowledge. Id. In Kumho, 526 U.S. at 141-42, 119 S.Ct. at 1171, the Supreme Court stated:
[T]he test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.
The trial court's inquiry must be tied to the specific facts of the particular case. The abuse of discretion standard applies to the trial court's ultimate conclusion as to whether to exclude expert witness testimony and to the trial court's decisions as to how to determine reliability. Id.
*223 Under Louisiana Code of Civil Procedure article 1428, a party has a duty to seasonably supplement his discovery response with respect to any question directly addressed to the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony. A trial court has great discretion in determining whether to admit testimony after a party objects on the ground that his opponent failed to fulfill the statutory mandate to supplement discovery requests. Bozeman v. State, 34,430 (La.App. 2 Cir. 4/4/01), 787 So.2d 357, writ denied, XXXX-XXXX (La.6/29/01), 794 So.2d 813.
Neither Freeport's answers to interrogatories, nor the Pretrial Order filed less than one month before trial, indicated that they intended to have Ms. Terry testify about custom and usage in the industry regarding gas contracts, and the first mention that she would be called to testify specifically regarding the settlement proceeds at issue in this case came in the pretrial order filed less than a month before trial. Ms. Terry's proffered testimony relates solely to the allocation of the money paid by Freeport in settlement with the MMS.
It appears that the court did not confine Freeport's use of Ms. Terry's expert testimony to the designation given in the Pretrial Order, as the court allowed her to testify in an area not designated in the pretrial order, and refused to allow testimony on the subjects designated therein. Instead, the denial by the court was due to her lack of qualification in those areas of alleged expertise.
Based upon Ms. Terry's qualifications as reported by her at trial, we find no abuse of discretion by the court in its decision to refuse to allow portions of her testimony.

Assignment of Error Number 5
Freeport alleges that the trial court misinterpreted and misapplied Louisiana Civil Code Article 2053 in basing its decision on clearly irrelevant evidence and testimony concerning performance in other, unrelated contracts involving third parties. Specifically, Freeport alleges that the trial court erred in admitting and giving significant weight to (1) the definition of "excess royalty" contained in a 1988 "Amendment to Unit Operating Agreement" between Freeport and TXP, a Transco company; and (2) Mr. Hosey's testimony concerning the Greens Creek Field settlements.
Article 2053 provides that doubtful provisions in contracts must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties.
While cross-examining Mr. Amato, the defense attorney showed him a copy of the 1988 Amendment to Unit Operating Agreement relating to an MMS lease. Mr. Amato testified that he did not recall ever seeing the document before, but did verify that the signature on behalf of Freeport was Mr. Jeanfreau's. No objection was made by Freeport's counsel while Mr. Amato was questioned about the document. After completing the cross-examination of Mr. Amato, Transco offered the document into evidence, and Freeport objected at this time, based on the fact that Mr. Amato had testified that he did not recall seeing it before. Transco countered that Mr. Amato had identified Mr. Jeanfreau's signature and had testified that Mr. Jeanfreau was authorized to execute the agreement on behalf of Freeport. The trial court overruled Freeport's objection. Now, on appeal, Freeport alleges that the document should not have been admitted into evidence because it was not relevant, *224 since it concerned a unit operating agreement rather than a gas contract settlement. Since Freeport did not object to the relevance of this document at trial, they cannot now raise the objection on appeal. Furthermore, there is nothing in the trial court's reasons to support Freeport's assertion that the trial court gave any amount of weight to this particular piece of evidence.
Freeport's second argument is that the trial court should not have considered Mr. Hosey's testimony concerning the Greens Creek Field Settlement because it was not a contract between the same parties. While it is true that Harkins and Company was not a party to the contracts at issue in this suit, Mr. Hosey testified regarding Petro Lewis's conduct at the time of the contract, which is a factor that may be considered under Article 2053. Furthermore, there is nothing in the trial court's reasons to support Freeport's assertion that the trial court placed a significant amount of weight on this testimony, or to imply that the trial court gave this testimony any weight at all.

Assignment of Error Number 6
Freeport's last assignment of error is that the trial court erred in rendering judgment against them because the contractual interpretation urged by Transco renders the excess royalty clause meaningless, in violation of Louisiana Civil Code article 2049.
Louisiana Civil Code article 2049 provides that a provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. Freeport's argument is that accepting Transco's interpretation of the clause, that Transco was only obligated to reimburse Freeport for royalty on amounts it did not receive, renders the provision meaningless because the MMS has never collected royalty on a sum not received by a producer under a gas contract settlement. The testimony at trial was to the effect that Transco agreed to take on the risk that the MMS would claim royalty on sums not received by the producer. Under those circumstances, the provision is not rendered meaningless.

CONCLUSION
For the above reasons, we affirm the judgment of the trial court denying Freeport's reimbursement claims. Costs of this appeal are to be borne by the plaintiffs.
AFFIRMED.
GUIDRY, J., concurs.
McCLENDON, J., concurs.
NOTES
[1] This settlement was actually negotiated between Petro Lewis, which was later acquired by Freeport, and Transco.
[2] Since the Master Settlement Agreement excluded the $25.4 million lump sum payment from Transco's "excess royalty" obligation, Freeport's reimbursement claim under the Master Settlement Agreement is limited to excess royalties that Freeport paid the MMS on the Premium Sum.