57 So.3d 1043 (2010)
AMITECH U.S.A., LTD.
v.
NOTTINGHAM CONSTRUCTION COMPANY.
No. 2009 CA 2048.
Court of Appeal of Louisiana, First Circuit.
October 29, 2010.
Rehearing Denied March 28, 2011.
*1047 Michael D. Hunt, A. Paul LeBlanc, Jr., Baton Rouge, Louisiana, for Plaintiff/1st Appellant Amitech U.S.A., Ltd.
Murphy J. Foster, III, J. Mark Robinson, Baton Rouge, Louisiana, for Defendant/2nd Appellant Nottingham Construction Company, Inc.
Before WHIPPLE, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
A contractor appeals a trial court judgment that rescinded an alleged settlement agreement between said contractor and an owner for whom the contractor had constructed a pipe manufacturing facility. The owner also appeals a judgment following a trial on the merits, which awarded the contractor $893,520.00 after the amounts the trial court determined the parties owed to each other were offset. For the following reasons, we affirm the judgment that rescinded the purported settlement agreement, but amend the trial courts judgment following the trial on the merits to reflect that the owner is entitled to an award of $5,560.00 after the awards are offset.

FACTS AND PROCEDURAL HISTORY
Amitech U.S.A., Ltd. (Amitech) was created to bring certain foreign pipe-manufacturing processes (the Meyer and Flowtite processes) to North America. In 2001, Amitech hired Ron Cormier, who resided in Ohio, as a manager,[1] and it began considering locations within the United States to build a pipe manufacturing plant that would utilize the Meyer and Flowtite processes.
Richard Vanek, a former business acquaintance of Cormier, suggested that Baton Rouge, Louisiana may be an attractive location for a plant because remedial work was required on the city's sewer systems and infrastructure, which could result in the use of Amitech's products. Vanek also suggested that Nottingham Construction, L.L.C. (Nottingham), a general contractor with experience in municipal and industrial construction, was a contractor in Baton Rouge that could construct Amitech's facilities. In February 2001 and again in April 2001, Cormier traveled to Baton Rouge to meet with Ted Hicks, who was the principal of Nottingham.[2]
In May 2001, Nottingham representatives, at Cormier's request and Nottingham's expense, agreed to travel to Europe to tour pipe manufacturing facilities that employed the Meyer and Flowtite processes. After returning from Europe, Nottingham *1048 submitted a proposal to Amitech, containing an estimate of costs for the construction of certain elements of the Meyer and Flowtite facilities in East Baton Rouge Parish.
In June 2001, Cormier traveled to Europe and made presentations to Amitech's parent company, Saudi Arabian Amiantit Company (Amiantit), which owns pipe manufacturing facilities throughout the world. Cormier's presentation reflected that "the total project cost for commissioning a North American production facility is assumed to be $26.02 million." At the conclusion of the presentation to Amiantit, Cormier was provided with verbal authorization to proceed with the efforts to construct a pipe manufacturing facility in North America.
In November 2001, at Cormier's request, Nottingham representatives, along with design professionals, took another trip to Europe to tour Meyer and Flowtite facilities. The representatives spent approximately one day touring a Meyer facility and one day touring a Flowtite facility. Amitech reimbursed Nottingham and the design professionals for their expenses incurred for this second trip.
Following the November 2001 trip to Europe, Nottingham and Amitech negotiated and entered into a Design-Build Contract, which was executed by the parties on February 26, 2002. The primary dispute at issue arises out of the scope of the work Nottingham was required to complete in accordance with the Design-Build Contract.
In the spring of 2003, Nottingham and Amitech reached an impasse concerning the amount due Nottingham for its work under the Design-Build Contract. As a result, the parties engaged in a several-month-long process to resolve the claims between them, resulting in two agreements, namely a letter agreement dated June 30, 2003, and an agreement styled "Program Management Agreement" dated July 2, 2003.[3] Both the letter and the agreement (sometimes collectively referred to as "the settlement agreement") were signed by Cormier in his capacity as "President" of Amitech.
On July 31, 2003, Amitech filed the instant action against Nottingham to rescind the settlement agreement, alleging that Cormier did not possess the requisite authority to bind Amitech to the settlement agreement. Nottingham filed an answer and a reconventional demand, wherein it sought to enforce the settlement agreement. Amitech amended its petition to assert claims for breach of fiduciary duty, breach of contract, and, alternatively, rescission of the Design-Build Contract.
Prior to trial, Amitech filed a motion for partial summary judgment, seeking to dismiss Nottingham's suit to the extent it sought enforcement of the settlement agreement. On September 19, 2008, the trial court granted Amitech's motion and rescinded the settlement agreement. Specifically, the trial court found that Amitech had not provided written authority to Cormier to settle, and absent such authority, *1049 Cormier could not enter into a valid settlement agreement. Moreover, in its September 25, 2008 judgment, the trial court ordered Nottingham to return the $409,000.00 that Nottingham had received from Amitech pursuant to the purported settlement.
In response to the trial court's grant of Amitech's motion for partial summary judgment, Nottingham amended its reconventional demand, asserting that in the event the settlement agreement was not enforceable, Nottingham was entitled to damages in the amount of its claims existing prior to the parties' settlement of disputes.
A bench trial was conducted between September 29 and October 8, 2008. After trial, the court took the matter under advisement, and subsequently issued its written reasons for judgment. The judgment awarded Nottingham $1,040,000.00 less an amount recoverable by Amitech of $146,480.00, resulting in a net amount awarded to Nottingham of $893,520.00.

ASSIGNMENTS OF ERROR
Nottingham has appealed to seek enforcement of the putative settlement agreement and has assigned three errors, raising the following issues for review:
(1) Whether, in the absence of written evidence authorizing an agent to enter into a settlement agreement, a third party may enforce the settlement agreement against the principal based upon the theory of apparent authority?
(2) Whether, in the absence of written evidence authorizing an agent to enter into a settlement agreement, a third party may enforce the settlement agreement against the principal based upon estoppel and detrimental reliance as permitted by La. Civil Code art. 1967.
(3) Whether Nottingham demonstrated genuine issues as to material facts prohibiting Amitech from an award of summary judgment which rescinded a settlement agreement in conjunction with Issue Nos. 1 and 2.
Amitech has also appealed, assigning the following as errors:
(1) The trial court erred in finding that no fiduciary duty existed between Amitech and Nottingham.
(2) The trial court erred in failing to properly interpret the Design-Build Contract, and as a consequence further erred by finding that Amitech was not owed reimbursement for Nottingham's failure to deliver the scope of the work contemplated by the contract price.
(3) Alternatively, the trial court erred in not rescinding the Design-Build Contract.
(4) The trial court erred in awarding Nottingham $800,000 for "Extra Fill and Site Work."
(5) The trial court erred in awarding Nottingham $240,000 as part of an "early completion bonus."

THE PURPORTED SETTLEMENT AGREEMENT
Nottingham has appealed to seek review of the trial court's failure to enforce the purported settlement agreement entered into between the parties. In response, Amitech has filed a motion to dismiss Nottingham's appeal, asserting that Nottingham waived its right to appeal the settlement issue by proceeding to trial on the post rescission demand. We disagree. The granting of the motion for partial summary judgment was a partial final judgment from which no right to appeal existed absent a designation by the trial court. See LSA-C.C.P. arts. 1911 and *1050 1915.[4] We recognize that the trial court declined to designate the partial summary judgmentan interlocutory rulingas final for purposes of an immediate appeal pursuant to LSA-C.C.P. art. 1915(B). However, after an appealable judgment is rendered in a case, the correctness of any interlocutory judgment can also be considered on appeal. Vanderbrook v. Jean, 2006-1975, p. 6 n. 4 (La.App. 1 Cir. 2/14/07), 959 So.2d 965, 968, n. 4; People of Living God v. Chantilly Corp., 251 La. 943, 947-48, 207 So.2d 752, 753 (1968). Accordingly, once the trial court signed the final judgment following the trial on the merits, Nottingham could seek review of the prior interlocutory ruling with regard to the settlement issue. Therefore, Amitech's motion to dismiss Nottingham's appeal is hereby denied.
Nottingham contends that the trial court, by focusing solely on whether Cormier possessed express authority to enter into the agreement, failed to consider whether Nottingham could enforce the settlement agreement against Amitech based upon the theory of apparent authority. The judicial understanding of the principles of apparent authority are analogous to the concept of putative mandatary set forth in LSA-C.C. art. 3021. See Walton Constr. Co., L.L.C. v. G.M. Home & Co., Inc., 07-0145, p. 12 (La.App. 1 Cir. 2/20/08), 984 So.2d 827, 836. Under this theory, an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction. Walton Constr. Co., L.L.C., 07-0145 at p. 10, 984 So.2d at 835.
To support its position that a putative mandate existed, Nottingham notes that Cormier was the duly elected President of Amitech and was the only manager domiciled in the United States. Nottingham avers that the remaining managers visited Louisiana a total of possibly two to three times over the course of the construction. Nottingham asserts that Cormier took actions daily (for a period in excess of two years) on behalf of Amitech without the written approval or even knowledge of Amitech's overseas managers. Particularly, Nottingham notes, among other things, that Cormier negotiated and executed the Design-Build Contract on behalf of Amitech, Nottingham received payments in the form of checks signed by Cormier in excess of $15,000,000.00, and Cormier participated in and consented to the performance of work beyond the scope of the Design-Build Contract for work performed at a cost in excess of $2,000,000.00. Hicks attested that not once did Amitech question, disavow, or challenge the authority of Cormier concerning actions taken on behalf of Amitech. As such, Nottingham concludes that it reasonably believed that Cormier had authority to settle the claims at issue.
Despite Nottingham's position regarding why it assumed a putative mandate existed, we note that Hicks understood that Cormier's authority was limited. Specifically, in his deposition, Hicks testified that Cormier did not "do anything or approve anything unless they called Hartmut and those guys over there . . . We would get approval from them once they talked to their people overseas." With regard to the cost-plus work, Hicks testified that "it was all done with Hartmut Ludwig's and theand all of the board's approval. Everything had to be approved by the entire *1051 group." Because Nottingham recognized that Cormier was required to obtain approval, we cannot conclude that a putative mandate with regard to Cormier's authority to settle existed herein.
Moreover, even assuming a putative mandate existed, we note that Amitech did not provide Cormier express written authority to enter into a settlement agreement. Louisiana Civil Code art. 2997 provides that express authority must be given to enter into a compromise. Louisiana Civil Code article 3072 requires that a compromise "be made in writing or recited in open court." Because the "law prescribes a certain form for an act, a mandate authorizing the act must be in that form." LSA-C.C. art. 2993. The comments to LSA-C.C. art. 2993 explain that when any act, such as a compromise, requires an authentic act or written form, a contract of mandate giving authority to do these acts must also be in authentic or written form. LSA-C.C. art. 2993, comment (c). Therefore, a third party cannot rely upon a putative mandate where the transaction at issue is one for which express authority is required under LSA-C.C. art. 2997. See Hoffman, Siegel, Seydel, Bienvenu & Centola, APLC v. Lee, 05-1491, p. 11 (La.App. 4 Cir. 7/12/06), 936 So.2d 853, 860, writ denied, 06-1995 (La.11/3/06), 940 So.2d 671 (apparent authority could not be utilized to refer a matter to arbitration where arbitration requires express authority under LSA-C.C. Art. 2997(5)).
Also, Nottingham is charged with knowing the statutory limitations of an agent. In Carey Hodges Associates, Inc. v. Continental Fidelity Corp., 264 So.2d 734, 736 (La.App. 1 Cir.1972), this court noted:
The jurisprudence of this state has been consistent in holding that the person who deals with a corporation is chargeable with notice of the limitations and restrictions placed upon it by statute and is generally bound to know whether or not the person who presumes to represent the corporation and act in its name is authorized to do so. Our jurisprudence holds additionally that the person dealing with an agent is put on his guard by the fact of the person's alleged agency alone and deals with him at his own risk. It is his duty to inquire into and ascertain the nature and extent of his powers as an agent and determine whether or not the act or contract about to be consummated comes within the province of his agency and will or will not bind his principal.[5]
Therefore, Nottingham could not rely upon an alleged putative mandate when express written authority was required by LSA-C.C. arts. 2993, 2997, and 3072. As such, assignment of error number one is without merit.[6]
In its second assignment of error, Nottingham urges that the trial court erred in holding a third party may not enforce a settlement agreement against the principal based upon estoppel and detrimental reliance as permitted by LSA-C.C. art. 1967.[7] Louisiana Civil Code article 1967 provides:

*1052 Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. To prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract. Rather, in determining whether a claim for detrimental reliance has been established, the focus is on whether the party proved three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment. East Tangipahoa Dev. Co., LLC v. Bedico Junction, LLC, 08-1262, pp. 13-14 (La.App. 1 Cir. 12/23/08), 5 So.3d 238, 246, writ denied, 09-0166 (La.3/27/09), 5 So.3d 146 (citing Suire v. Lafayette City-Parish Consolidated Gov't, 04-1459, p. 31 (La.4/12/05), 907 So.2d 37, 59.)
Nottingham notes that the Louisiana Supreme Court has indicated that a principal may be estopped from asserting the defense of lack of written authority if the third person can show a change of position in reliance on the appearance of authority manifested by the principal. Tedesco v. Gentry Dev., Inc., 540 So.2d 960, 964 (La. 1989). However, as we noted above, Nottingham's reliance was unreasonable given Hicks' acknowledgement that Cormier was required to obtain approval from the overseas managers prior to entering into transactions.
Moreover, the Louisiana Supreme Court later recognized that "[a]bsent fraud, or at least affirmative misrepresentations as to the necessity of a writing . . . it is almost always the case that it will be unreasonable to rely on an oral promise where the law requires such a promise to be in writing to be enforceable." See Morris v. Friedman, 94-2808, p. 10 n. 14 (La. 11/27/95), 663 So.2d 19, 26 n. 14; see also East Tangipahoa Dev. Co., LLC, 08-1262 at pp. 14-15, 5 So.3d at 247. In East Tangipahoa Dev. Co., LLC, this court held that it was not reasonable for the principal of East Tangipahoa Development to rely on an alleged oral agreement where an agreement to repurchase immovable property had to be in writing. East Tangipahoa Dev. Co., LLC 08-1262 at p. 15, 5 So.3d at 247. Because the law requires a writing giving an agent authority to enter into a valid settlement agreement, coupled with the fact that Nottingham was charged with knowledge of the limits of Cormier's authority, it was unreasonable for Nottingham to rely on Cormier's representations alone.
In light of the foregoing, we find that LSA-C.C. art. 1967 cannot be applied under these circumstances. Accordingly, Nottingham's assignment of error number two is without merit.[8]

*1053 TRIAL ON THE MERITS

Fiduciary Duty
In its first assignment of error, Amitech contends that the trial court erred in finding that Nottingham owed it no fiduciary duty. Amitech asserts that the dealings between it and Nottingham prior to the execution of the February 26, 2002 Design-Build Contract created a fiduciary relationship, which Nottingham breached by failing to act honestly and divulge material information. Amitech seeks damages for what it deems was an unreasonable profit earned by Nottingham in relation to the Design-Build Contract and Amitech's acquisition of real estate.
Amitech notes that Hicks agreed to assist in Amitech's acquisition of real estate upon which a plant could be constructed. Hicks directed Amitech to a certain parcel located in Zachary, Louisiana ("the Zachary Property"), upon which his son, Kyle Hicks, obtained an option "about the same time" Hicks showed Amitech the property. The price quoted to Amitech to purchase various acreages of the Zachary Property was more than double the per acre price under the option held by Hicks' son. The option was later extended several times by Nottingham, Hicks, VANED, L.L.C.,[9] Kyle Hicks, and/or Hartec Corporation (a corporation owned and operated by Hicks). At some point during the initial negotiations, the parties anticipated that Nottingham would acquire financing to purchase the property, construct the facility, and then lease the plant to Amitech.
However, in November 2001, because Nottingham could not secure financing absent a guarantee from Amitech, Amitech made the decision to purchase the Zachary Property and finance the construction of the facility. On December 7, 2001, after learning that Amitech would purchase the property, Nottingham invoiced Amitech $30,000.00 "to extend [the] option through February 24, 2002 for purchase of 52 acres on Hwy 61." (Emphasis added.) Amitech paid the $30,000.00, and contends it was in turn used by Nottingham to extend the option on the Zachary Property on Nottingham's behalf.
In January 2002, an Amitech board meeting was held in Baton Rouge. The board, after reviewing a presentation of the site plan, objected to the proposed location of the plant because it was sited immediately adjacent to a residential trailer park. As a result, Hicks informed Amitech that the entire 94-acre tract was available. Amitech's overseas managers approved acquisition of the 94-acre tract at the price quoted by Hicks. However, Amitech was unaware that the entire tract was already subject to an option held by Nottingham and financed (at least in part) by the $30,000.00 payment made by Amitech.
Two Zachary Property transactions occurred on February 26, 2002Nottingham purchased the entire 94-acre tract from its owner for $448,300.00 and then sold the property to Amitech for $911,800.00. Cormier was not aware that Nottingham had purchased the property until he appeared at the latter closing that day. Both Nottingham's purchase of the property and the immediate re-sale to Amitech were funded exclusively by Amitech. Only one settlement statement was prepared and Nottingham was paid off as if it were a mortgagee of the Zachary Property. Although Cormier posited that he did *1054 not believe Hicks was acting as Amitech's agent, Cormier testified that Hicks "had negotiated with the owner for acquiring that land for us."
Generally, whether a fiduciary duty exists and the extent of that duty depends upon the facts and circumstances of the case and the relationship of the parties. Scheffler v. Adams and Reese, LLP, 06-1774, p. 6 (La.2/22/07), 950 So.2d 641, 647. As a basic proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties. The Uniform Fiduciaries Law, LSA-R.S. 9:3801(2) defines "fiduciary":
"Fiduciary" includes a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other persons acting in a fiduciary capacity for any person, trust or estate.
The dominant characteristic of a fiduciary relationship is the confidence reposed by one in the other and a person occupying such a relationship cannot further his own interests and enjoy the fruits of an advantage taken of such a relationship. He must make a full disclosure of all material facts surrounding the transaction that might affect the decision of his principals. Plaquemines Parish Com'n Council v. Delta Dev. Co., Inc., 502 So.2d 1034, 1040 (La.1987). One is said to act in a "fiduciary capacity" when the business which he transacts, or the money or property he handles, is not his own or for his benefit, but for the benefit of another person, as to whom he stands in relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part. State v. Hagerty, 251 La. 477, 493, 205 So.2d 369, 374-75 (1967), cert, denied, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 855 (1968).
We recognize that the initial options taken on the Zachary Property were done at Nottingham's sole risk insofar as there was no guarantee that Amitech would utilize this location to construct a pipe manufacturing facility. However, the intentions of the parties and their respective positions with regard to the property changed after Amitech turned from a future lessee into a future owner and Nottingham no longer bore any further risk. After Nottingham learned that Amitech would purchase the property and construct its own facility, Nottingham, rather than utilizing its own funds to extend the option, billed Amitech to fund the extension of the option. Nottingham's invoice clearly reflects that the $30,000 was being utilized to "extend" a prior option. The invoice does not reflect that Amitech was buying an option to purchase the property directly from Nottingham.
In light of the foregoing, we find that Nottingham owed a fiduciary duty to Amitech with regard to this specific real estate transaction. The money Nottingham handled in connection with the final option extension and the business it transacted in that regard was not its own or for its benefit, but for the benefit of Amitech. Hagerty, 205 So.2d at 374-75. The fiduciary's duty includes the ordinary duties owed under tort principles, as well as a legally imposed duty which requires the fiduciary to handle the matter "as though it were his own affair." Noe v. Roussel, 310 So.2d 806, 819 (La.1975). In addition, the fiduciary may not take even the slightest advantage, but must zealously, diligently, and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition *1055 or conflict with the interest of the principal to even the slightest extent. Id.
As such, Nottingham was required to disclose, among other things, the price contained in the option agreement. Amitech has shown a breach of the trust it placed in Nottingham, and Nottingham has failed in its duty not to take the slightest advantage of that trust. Therefore, Amitech is entitled to recover from Nottingham the profits Nottingham made on the real estate transaction as a result of the breach. Cf. Woodward v. Steed, 28,676 (La.App. 2 Cir. 9/25/96), 680 So.2d 1320, writ not considered, 96-2648 (La. 12/6/96), 684 So.2d 411.
Amitech also seeks recovery for what it considers an "unreasonable" profit made by Nottingham in constructing the facility. Amitech contends that Nottingham ultimately earned a profit of at least $6,904,948.26 against Amitech's total cost of $13,336,908.29, or a profit of more than 100% of cost. Amitech asserts that this occurred at the same time Nottingham was the paid consultant of Amitech, was providing Amitech with legal and real estate services, and was assisting Amitech in developing its building plan. Amitech urges that based on these facts, the trial court manifestly erred in failing to find a fiduciary relationship and a breach of same when considering the amount Amitech earned under the contract.
We note that the parties freely negotiated the terms of the Design-Build Contract in an arms-length transaction. A court is not to be concerned with the wisdom or folly of a contract. It cannot annul or amend it simply to avoid some supposed hardship arising therefrom. Its duty is confined to the ascertainment of the limits of the rights and obligations of the contracting parties as they have defined them for themselves. Weeks v. T.L. James & Co. Inc., 626 So.2d 420, 424 (La.App. 3 Cir.1993), writs denied, 93-2909, 93-2936 (La.1/28/94) 630 So.2d 794. As such, a court cannot undermine a contract simply because it was a bad deal for one of the parties. Id. Accordingly, we affirm the trial court's judgment to the extent that the trial court found that no fiduciary duty was breached when the parties entered into the Design-Build Contract.

Scope of Work Under the Design-Build Contract
In its second assignment of error, Amitech contends that the trial court erred in failing to properly interpret the Design-Build Contract, and as a consequence further erred by finding that Amitech was not owed reimbursement for Nottingham's failure to deliver the scope of work contemplated by the contract price.
Amitech notes that Nottingham posits that it was only required to deliver the "shell" of the buildings with no interior electrical or mechanical processes, but Amitech contends that the contract documents required Amitech to deliver full electrical and mechanical installation in the Meyer and Flowtite buildings, excepting only process equipment and installation of same.
Article 1.01 of the Design-Build Contract described the work contemplated by the contract as follows:
Construct site improvements, including but not limited to, rail road crossing, access road, paving, parking, limestone storage, signs, outside lighting, security fencing, utilities, landscaping; construct 4,000 sq. foot administration building; construct 3,000 sq. foot maintenance building; construct 4,000 sq. foot employee building; construct two (2) 4,000 sq. foot warehouses; construct 55,000 sq. foot "Meyer" building; and construct 24,500 sq. foot "Flowtite" building.
*1056 Moreover, Article 3.01(B) of the general conditions of the contract provides:
It is the intent of the Contract Documents to describe a functionally complete Project (or part thereof) to be designed and constructed in accordance with the Contract Documents. Any Work, materials or equipment that may reasonably be inferred from the Contract Documents or from prevailing custom or trade usage as being required to produce the intended result will be furnished and performed whether or not specifically called for. When words or phrases which have a well-known technical or construction industry or trade meaning are used to describe work, materials or equipment, such words or phrases shall be interpreted in accordance with that meaning.
Article 8.01 of the Design-Build Contract further provides that "[t]he Contract Documents which comprise the entire agreement between OWNER and DESIGN/BUILDER concerning the Work consist of," among other things, "Conceptual Documents" and the "DESIGN/BUILDER'S Proposal."
Amitech notes that at trial, Hicks testified that the only "Conceptual Documents" were Flowtite schematics and a proposed layout of the Meyer Building. Amitech further notes that Hicks testified that the Budget Review document was the "DESIGN/BUILDER'S Proposal," and other than the specific changes specified in the Design-Build Contract, there were no documents in existence which changed the scope of this proposal.
Amitech avers that the Budget Review Document clarifies the scope of a number of construction items, including specific items with regard to the Flowtite and Meyer Buildings. The document reflects that the Flowtite Building will be constructed "as per the copyright Flowtite Technology 2001 drawings and specifications," excluding "all equipment and/or installation of same." The drawings and specifications include details for full mechanical and electrical service. Also, the Budget Review document specifies that the Meyer Building includes "handrails, ladders, mezzanine decks, electrical, and mechanical," excluding only "all equipment and/or installation."
Amitech contends that the evidence showed that at least into the last quarter of 2002, Nottingham was proceeding as per the scope of work set out in the Budget Review Documentcompleting electrical and mechanical services to the Meyer and Flowtite buildings, excepting only equipment and installation of same. Amitech also asserts that Nottingham's engineering subcontractors proceeded in the months prior and after the Design-Build Contract's execution with an understanding of a scope of work that included interior mechanical and electrical services that would result in a functional manufacturing facility and prepared plans depicting such interior services, as well as structuring drawings regarding the foundations upon which particular pieces of equipment would sit. Amitech concludes that the trial court erred as a matter of law in failing to give full effect to the referenced documents.
On the other hand, Nottingham points out that at the time the parties entered into the Design-Build Contract, neither party was aware of the specific equipment which Amitech would ultimately install in the facility. Hicks testified that as a result, at the time the contract was entered into it was "impossible for [Nottingham] to give a contract price on anything other than the shells." Without information concerning the equipment and its layout, Hicks testified that there was no way for Nottingham to establish a scope of work to address differing loads of the equipment *1057 and the attendant special foundations required to meet those loads, nor the requirements of the equipment for power supply, water supply, and drainage. Cormier testified that the Design-Build Contract only contemplated a "shell," because Nottingham had no information with regard to the "electrical and the support slab" at the time the parties entered into the contract.
Similarly, Keith Shackelford, an employee of CSRS, Inc.,[10] explained that a Design-Build Contract is a "fast-track process" that saves time, but rarely saves money. He indicated that during construction, components are being designed as construction progresses. He testified that at the time the Design-Build Contract was signed, Nottingham may have received a list of the requisite electrical loads, but the parties had no knowledge whether any of the foreign components were compliant with codes in the United States. He also indicated that Nottingham did not have any information with regard to loads to determine the requisite foundations. Moreover, because alternate layouts were being considered, Nottingham did not have any information with respect to drainage requirements for different pieces of equipment.
Nottingham also points out that Bill McCann, an operations manager for Amitech, monitored Nottingham's construction efforts. Nottingham notes that while it was working on the construction of the facility, McCann hired third-party designers and contractors on behalf of Amitech to perform work simultaneously with Nottingham's work. Moreover, Nottingham contends that McCann never indicated, either in writing or verbally, an understanding that the additional work performed by these third-party contractors was actually within Nottingham's scope of work pursuant to the Design-Build Contract. Nottingham notes that Amitech approved additional work performed by Nottingham, which was billed outside of the scope of the Design-Build Contract, as evidenced by payment of the invoices. Nottingham argues that these facts establish that additional work outside the scope of the Design-Build Contract was anticipated by the parties.
Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. Freeport-McMoran, Inc. v. Transcontinental Gas Pipe Line Corp., 04-0031, p. 7 (La.App. 1 Cir. 10/14/05), 924 So.2d 207, 212, writ denied, 05-2358 (La.3/31/06), 925 So.2d 1256 (citing Investors Associates Ltd. v. B.F. Trappey's Sons, Inc., 500 So.2d 909, 912 (La.App. 3 Cir.), writ denied, 502 So.2d 116 (La. 1987)). However, when the terms of a written contract are susceptible of more than one meaning, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity, show the intention of the parties, or prove fraud. Freeport-McMoran, Inc., 04-0031 at p. 7, 924 So.2d at 212.
Louisiana Civil Code article 2045 defines interpretation of a contract as "the determination of the common intent of the parties." Such intent is to be determined *1058 in accordance with the plain, ordinary, and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Moreover, Louisiana Civil Code article 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." The rule of strict construction does not authorize perversion of language or the creation of ambiguity where none exists and does not authorize courts to make a new contract where the language employed expresses the true intent of the parties. One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for a period of many years. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Freeport-McMoran, Inc., 04-0031 at p. 7, 924 So.2d at 212. Whether a contract is ambiguous or not is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. Freeport-McMoran, Inc., 04-0031 at p. 8, 924 So.2d at 213.
Because the terms of the Design-Build Contract were not "clear and unambiguous" with regard to the scope of the project, factual findings are pertinent to its interpretation and the trial court's findings are not to be disturbed unless manifest error is shown. Under the manifest error standard, if the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given great deference by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).[11]
In denying Amitech's claim for reimbursement for items associated with the building interior, the trial court reasoned:
While Amitech brought forth several documents to support [its] position, the exhibits do not establish the scope of interior electrical and mechanical work now claimed by Amitech. At best, they establish only that some electrical and mechanical work was contemplated. In fact, the "shell buildings" provided by Nottingham under the Design-Build Contract do contain some electrical and mechanicalcertainly enough to support the position of Nottingham that the additional electrical and mechanical work invoiced under the cost-plus contract was extra work beyond the scope of the Design-Build Contract. As additional evidence of the intent of the parties throughout the course of the Project on this issue, Amitech (after review by McCann and Cormier) paid in full, without objection, the cost-plus invoices submitted by Nottingham. Clearly, such contemporaneous action by McCann and Cormier in accepting such work as cost-plus extra work flies in the face of Amitech's and McCann's position taken at trial that such work properly fell within the scope of the Design-Build Contract.
After considering the foregoing, and particularly in light of the credibility determinations made by the trial court, we find that a reasonable basis for the trial court's ruling appears in the record. Accordingly, *1059 we cannot conclude that the trial court's rejection of Amitech's claims for reimbursement for items associated with the buildings' interior was manifestly erroneous.
Amitech also asserts that despite Nottingham representatives visiting the manufacturing facilities overseas to ascertain what the pipe-manufacturing processes involved, Nottingham, in constructing the Meyer and Flowtite buildings, failed to address the noise, dust, and wastewater issues created by the processes, the electrical power required, the heat for the pipe-making processes, foundations sufficient to hold or seat the process equipment, as well as construct facilities necessary to accept raw materials used in the processes. Amitech also contends that other necessary components of buildings such as bathrooms, foreman offices, and control rooms were not built. Moreover, Amitech contends that additional work was required to bring the buildings up to code and/or work was deficiently performed that required correction.[12]
Amitech also claims that Nottingham invoiced Amitech separately for "engineering services" comprised of work done by Shackelford under the Design-Build Contract, to install trenches, and to perform a number of tasks ranging from providing utilities to modifications required by code. Amitech contends that these items were necessary for the facility to function as intended and should have been included in the contract price.
With regard to the referenced claims, the trial court, in its written reasons, indicated:
The Court has gone through each of these claims in detail in its review of the case. Much time and effort was expended by the Court in reviewing the exhibits and in going back over the testimony given during trial. The Court finds that most of the items claimed do not fall within the scope of the Design-Build contract and are, therefore, not recoverable by Amitech.[13]
After reviewing the record in its entirety, we find that a reasonable basis exists to support the trial court's ruling with regard *1060 to these specific items. Accordingly, we cannot conclude that the trial court's ruling with regard to any of these claims is manifestly erroneous.
Amitech also contends that the Design-Build Contract expressly includes a concrete "access road" and asserts that the trial court should have awarded it the monies necessary to complete the road. Amitech asserts that although a concrete road was required under the contract, Nottingham only constructed a limestone road.
Amitech notes that the Design-Build Contract requires Nottingham to furnish "[a]ny Work, materials or equipment that may reasonably be inferred from the Contract Documents or from prevailing custom or trade usage as being required to produce the intended result . . . whether or not specifically called for." Amitech submits that a concrete access road was needed to permit the plant to engage in its intended function, as the hauling of heavy pipes requires a paved access road.
Moreover, Amitech contends that a concrete access road was included in the "Unit Price Work" under the Design-Build Contract under "Paving, Parking, and Limestone Storage," which had a total estimated unit cost of $2,805,082.00. Amitech asserts that the unit price is unreasonable if the concrete access road is removed, given that all that remains is a parking lot for the administration building, lips around the buildings, and a limestone storage yard. Although the Design-Build Contract provided no specific cost breakdown, the Budget Review document prepared by Nottingham indicated a "[proposed 8 inch concrete paving for drives." After execution of the Design-Build Contract, Amitech notes that Shackelford began drawing plans for an access road with an 8-inch concrete surface that followed up site plan drawings prepared by Shackelford in January and March of 2002, both of which showed a 30-foot-wide concrete access road as part of the Amitech facility. Ultimately, Shackelford's plans for a paved access road were "issued for construction" in July of 2002, and constituted his "final design."
The trial court, in finding that a concrete road was not included in the price of the contract, indicated that "[t]he testimony of Shackelford, Hicks and Cormier convinces this Court that both parties intended that the access road be concrete," but that the "cost was going to be absorbed by the City/Parish."[14]
Specifically, Hicks testified that when the Design-Build Contract was signed, the parties understood that the Department of Economic Development (the Department) would fund the roadway. Hicks testified that the Department had set a budget funding number of $750,000.00 to dedicate to the roadway, and that he was certain that the funds would come through at the time the parties entered into the Design-Build Contract. Hicks also indicated that Nottingham did not include any charges for a concrete road in the Design-Build Contract. Hicks testified that the Department later determined that it would not be able to fund the roadway as a private street, so he met with local officials to determine a mechanism to make the roadway public. Hicks indicated that after *1061 Nottingham left the site, Ludwig decided that he did not want a public road in the facility.
Similarly, Shackelford testified that during the initial stages of planning, upgrading the limestone roadway to a thirty-foot concrete drive was contingent on receipt of funds from the Department. Although the plans reflected a thousand linear foot access road, Shackelford testified that the estimate he used for calculation of his engineering fees reflected the cost of the roadway at one hundred dollars per linear foot, or the cost of a limestone road. Shackelford indicated that a concrete roadway could not be built for such a low price, so the Design-Build contract provided for something other than a paved roadway for access initially.
Moreover, Cormier testified that the Department indicated that it would "help" with the roadway. Cormier also pointed out that these discussions occurred long before the parties entered into the Design-Build Contract.
Nevertheless, Amitech argues that the trial court, in making its ruling, failed to consider the contract change order Nottingham submitted with its final application for payment. The change order reflected a reduction of $276,300.00 and the justification was to "[djeduct for Road, turnouts, fire hydrant and builders risk."[15] Amitech contends that the change order shows that Nottingham, prior to this litigation, recognized that a concrete access road was included in the scope of the Design-Build Contract. We note, however, that Hicks testified that his understanding was that the credit was for "eight-inch paving that was around the back side of the Flowtite Building." Hicks further indicated that it is implausible for one to conclude that the credit was for completion of a concrete roadway insofar as the roadway would have cost significantly more than the proposed credit. Moreover, Joseph Caldererra, an expert in the field of construction and construction cost estimating, estimated that the cost of the concrete access road was approximately $462,099.00, which is significantly higher than the amount reflected in the change order.
In light of the foregoing, we find that a reasonable basis exists in the record for the trial court's ruling. Although we may have reached a different conclusion had we been sitting as a trier of fact, we cannot substitute our judgment for the judgment of the trial court. Ryan v. Zurich American Ins. Co., 07-2312, p. 1 (La.7/1/08), 988 So.2d 214, 215. Accordingly, we cannot conclude that the trial court's failure to assess Nottingham with costs to construct a concrete road was manifestly erroneous.

Rescission of the Design-Build Contract
In its third assignment of error, Amitech contends that the trial court erred in not rescinding the Design-Build Contract. Amitech asserts that the trial court failed to articulate any scope of work, finding that "the Specifications and Plans were developed on a continual basis and the Project details were decided between the parties as issues arose and as the Project progressed." Amitech concludes that if the court accepts that the scope was simply that which evolved as the project progressed, then the contract lacked a determinable object at the time it was executed and should be rescinded. See LSA-C.C. arts. 1971 and 1973.
We disagree. The trial court found that the parties intended Nottingham to provide the "basic framework of the Project" under the Design-Build Contract, with the exception of the Administration Building, *1062 which the parties intended to be completed under the scope of the contract. The trial court also found that the parties intended for anything that fell outside of the scope of the Design-Build Contract, including much of the interior work in both the Meyer and Flowtite buildings, to be completed on a cost-plus basis. Moreover, Amitech's actions in hiring third-party contractors to complete work contemporaneously with the work being performed by Nottingham and in approving and paying most of Nottingham's cost-plus invoices reflects Amitech's understanding that the Design-Build Contract did not contemplate a finished facility. Accordingly, we find no merit in Amitech's third assignment of error.

Extra Fill and Site Work
In its fourth assignment of error, Amitech contends that the trial court erred in awarding Nottingham $800,000 for "Extra Fill and Site Work." As noted above, after learning that the initial plans sited the Amitech facility next to a residential trailer park, Amitech decided to move the buildings on the property to provide an additional buffer to the trailer park. In a letter to Cormier dated February 4, 2002, Hicks wrote:
The costs to relocate the plant to the rear and opposite side of the property [cannot] be determined until elevations are established and final quantities of dirt are in place. By using this method we can use actual quantities and not estimated quantities.
We will submit the actual costs once all fill is in place and the new entrance road is complete.
Amitech notes that a few weeks later, the parties signed the Design-Build Contract, which obligated Nottingham to perform the "Work" defined in Article 1.01 to include "site improvements." Article 3.01(B) of the general conditions of contract specifies that "[a]ny work, materials or equipment that may reasonably be inferred from the Contract Documents or from prevailing custom or trade usage as being required to produce the intended result will be furnished and performed whether or not specifically called for." Additionally, Article 3.01(A) of the general conditions of the Design-Build Contract further specifies that "[t]he Contract Documents comprise the entire agreement between OWNER and DESIGN/BUILDER concerning the Work." Finally, Article 10.01 of the General Conditions states that "[t]he Contract Price constitutes the total compensation (subject to authorized adjustments) payable to DESIGN/BUILDER for performing the Work."
Amitech notes that the trial court found that an agreement existed to compensate Nottingham for extra fill and dirt work due to Amitech changing the location of the plant, because "the extra fill was not contemplated in the original Budget Review document as the buildings were contemplated to be placed close to the highway, where the elevations were higher." Amitech asserts that in so finding, the trial court erred as a matter of law by failing to give effect to the unambiguous language of the Design-Build Contract making it the parties' "entire agreement" concerning "the Work," and further specifying that the "Contract Price" was the "total compensation" to be paid for "the Work," including all "site improvements." Amitech urges that the Design-Build Contract displaced any antecedent agreement about the cost of "the Work," and to construe the contract language otherwise would render the integrative and exclusive price clauses meaningless.
Additionally, Amitech contends that in ruling, the trial court ignored the subsequent actions of the parties, which it alleges were inconsistent with the existence of *1063 any enforceable obligation. Amitech notes that in March 2002, Cormier prepared a summary of potential cost overruns, but the document did not reflect "extra fill." Amitech also notes that it was not invoiced for the dirt work, but received a change order submitted on May 30, 2003, nearly a year after the dirt work was complete. After receiving the referenced change order, along with a second change order, Amitech notes that Cormier sent an e-mail to Amitech on June 9, 2003, which characterized the change orders as seeking "an extra one million dollars, which is outside the contract, and ridiculous." Amitech ultimately rejected this change order.
At trial, Hicks testified that he was aware that it would be more expensive to construct the plant at the new location, so he informed Nottingham that it would incur additional costs. Ludwig testified that following the decision to move the facility, he understood that Amitech "will incur some cost." Similarly, Cormier testified that he knew "that there would be some additional excavation . . . [and] that [Hicks] said he would be doing that on a cost-plus basis, but there would be an additional charge, yes." Hicks testified that because the Design-Build Contract was signed a few weeks after Amitech decided to move the plant, Nottingham was unable to include the final figures in the contract.
Moreover, Hicks testified that after the parties entered the Design-Build Contract, Nottingham, through Jim Montgomery, and McCann agreed on a unit price based on actual costs at the job site. Hicks testified that an agreement was reached because McCann knew that the parties agreed that the additional dirt work was to be done on a cost-plus basis.
We note that contracts have the effect of law for the parties. LSA-C.C. art. 1983. Courts are obligated to give legal effect to contracts according to the common intent of the parties. LSA-C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046.
Written construction contracts may be modified by oral contracts and by the conduct of the parties, even when the written contract contains a provision that an owner is liable only if the change orders are in writing. Cajun Constructors, Inc. v. Fleming Const. Co., Inc., 05-2003, p. 8 (La.App. 1 Cir. 11/15/06), 951 So.2d 208, 214, writ denied, 07-0420 (La.4/5/07), 954 So.2d 146 (citing Pelican Electrical Contractors v. Neumeyer, 419 So.2d 1, 5 (La. App. 4 Cir.), writ denied, 423 So.2d 1150 (La.1982)). Whether an oral agreement modifies a written contract is a question of fact. Id. While modification can be presumed by silence, inaction, or implication, one person may not change the terms unilaterally. L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354, p. 15 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1232, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438. The party asserting a modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification. LSA-C.C. art. 1831.
Although Amitech alleges that the Design-Build Contract subsumed the prior actions of the parties,[16] Hicks testified that after the Design-Build Contract was signed, the parties agreed that a unit sum for dirt work and fill was required in addition to the site improvement sum in *1064 the Design-Build Contract.[17] In light of Hicks' testimony in that regard, we cannot conclude that the trial court was manifestly erroneous in finding the parties agreed to modify the Design-Build Contract.
Amitech contends that even if an enforceable obligation existed, Nottingham failed to prove a quantum of damages. Amitech avers that Nottingham was unable to produce a single receipt or invoice associated with this "extra fill and site work." Rather, Amitech contends that the amount awarded by the trial court was based upon an unsubstantiated cost-per-yard figure applied by Hicks. Amitech notes that Nottingham had not calculated the difference between the costs of the site work at the original location as opposed to the cost of the work at the final location. Amitech further contends that the exhibits and testimony reflect that under the original site plan, the pipe storage yard (the single largest unit by area) ran deeper into the northwest section of the property, the lowest point on the tract, and thus would have required substantially more fill than was used in the final location. As such, Amitech concludes that Nottingham failed to prove that it incurred any greater cost than it would have incurred had the site location not changed.
At trial, Shackelford testified that the topographical relief in the area where the plant was constructed was three and a half to four feet lower than the original plant site. Shackelford indicated that the floor elevations for the buildings required that they be at an elevation of 98.5 feet. In order to meet the requisite elevation, Shackelford testified that roughly 65,000 cubic yards of compacted fill was required, or roughly 90,000 cubic yards of loose dirt. Based upon these figures it appears that Nottingham billed Amitech $8.89 per cubic yard of loose dirt.
Hicks and Shackelford testified that the dirt utilized to meet the requisite elevations included dirt taken from the detention pond. However, Hicks also testified that the detention pond was included in the scope of the Design-Build Contract and that Amitech had been charged for excavation of the detention pond. Hicks further indicated that regardless of the elevations of the original site, the dirt taken from the detention pond would necessarily have been placed on that site had the plant location not have been moved. Caldererra testified that considering the detention pond "in the smallest view," a minimum of 22,000 cubic yards of dirt had been removed. Because the scope of the Design-Build Contract, at a minimum, required Nottingham to excavate the pond and utilize the fill for Amitech's facility, we find that the trial court manifestly erred in failing to credit Amitech for 22,000 cubic yards of dirt, or $195,580.00.[18]

Early Completion Bonus
In its final assignment, Amitech contends that the trial court erred in awarding Nottingham $240,000.00 as part of an "early completion bonus." The contract time was defined in Article 3.01 of the Design-Build Contract, which required that the work "be substantially completed within 349 calendar days" of February 26, 2002. Article 3.03 of the Design-Build Contract provided an incentive for early completion and required Nottingham to pay Amitech "$5,000.00 for each and every day that the Work is completed prior to *1065 the time specified in paragraph 3.01 for Substantial Completion." Moreover, Article 11.02 of the General Conditions allowed extensions for delays beyond Nottingham's control, including abnormal weather.
Amitech subsequently executed Change Order Number 1, which extended the contract time by 23 calendar days, thereby increasing the total contract time to 372 days. Amitech, through McCann, accepted the work required by the Design-Build Contract on December 20, 2002, or 76 days prior to the requisite completion date.
On March 13, 2003, Nottingham made a written request for payment of an "early completion" incentive. Therein, Nottingham requested a total or $440,000.00, consisting of $380,000.00 from execution of Notice of Acceptance (76 days × 5,000.00 per day), and an additional $60,000.00 for "rain days" (60 days × 1,000.00 per day).
On May 19, 2003, Nottingham submitted Change Order Number 5, which reflected a $240,000.00 for "Adder Credits for future pipe purchases as agreed to by Ron Cormier." Amitech rejected this change order.
The trial court concluded that Nottingham had earned an "early completion bonus" of $680,000.00, consisting of the $440,000.00 reflected by the March 13, 2003 request, and the $240,000.00 "pipe credit" reflected in Change Order Number 5. In reaching this conclusion, the trial court found that Cormier agreed to extend the contract time an additional 120 days for abnormal weather. The trial court found, in accordance with the March 13, 2003 request for payment, that Nottingham would receive $1,000.00 per day for 60 days of abnormal weather, but it also found that Cormier agreed that Nottingham would be compensated with pipe credits in the amount of $240,000.00 for the remaining 60 days of abnormal weather. Amitech contends that the trial court's finding is unreasonable because the bonus was fixed upon substantial completion. Amitech asserts that Nottingham's own demand for payment on March 13, 2003 reflects no extension of contract times other than the 23-day extension reflected in Change Order Number 1. Amitech contends that the pipe credit, as Cormier testified, was simply another way to pay Nottingham part of the $440,000.00 it claimed as an early completion incentive. Amitech asserts that such an understanding was consistent with Nottingham's own documents, which set forth that the total calculation of the "early incentive bonus" was only $440,000.00, not $680,000.00. As such, Amitech concludes that this court should reverse the trial court's award of $240,000.00.[19]
After a thorough review of the record, we find no reasonable basis to support the finding that the parties agreed that Nottingham, in addition to the 60 days referenced in the March 13, 2003 request, would be compensated with pipe credits in the amount of $240,000.00 for an additional 60 days of abnormal weather. Accordingly, the trial court was manifestly erroneous in awarding this sum to Amitech.

CONCLUSION
In sum, we deny Amitech's motion to dismiss Nottingham's appeal, but affirm the district court's judgment on Amitech's motion for partial summary judgment that rescinded the settlement agreement. Amitech, as a result of Nottingham's breach of fiduciary duty with regard to the real estate transaction, is entitled to recover from *1066 Nottingham the profits Nottingham made on the real estate transaction, or $463,500.00. Amitech is also entitled to a credit of $195,580.00 for fill and dirt work because the work was contemplated and billed under the scope of the original Design-Build Contract. Additionally, the trial court's $240,000.00 pipe credit award to Nottingham was manifestly erroneous. Accordingly, after the referenced amounts are set-off against the remaining trial court awards, Amitech is owed a sum of $5,560.00.
Additionally, we note that the trial court, in its September 25, 2008, judgment, ordered Nottingham to return the $409,000.00 it had received pursuant to the purported settlement. Accordingly, considering the two judgments collectively, Nottingham is required to pay Amitech $414,560.00, plus interest from the date of judicial demand.
Each party is to bear their own cost for their respective appeals.
MOTION TO DISMISS APPEAL DENIED; JUDGMENT ON MOTION FOR PARTIAL SUMMARY JUDGMENT AFFIRMED; JUDGMENT ON MERITS AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] Amitech had three other managers, Hartmut Ludwig, Wehbe Rafih, and Fareed Khalawi, who all resided overseas.
[2] Ludwig accompanied Cormier on the first visit.
[3] In the letter, Amitech pledged to pay Nottingham $409,000.00 and enter into a Program Management Agreement to resolve all claims existing between the parties, and Nottingham agreed to cancel a lien that it had placed on Amitech's property. In the Program Management Agreement, Amitech designated Nottingham as Amitech's program manager and/or construction manager for all of Amitech's construction projects from April 15, 2003 through April 14, 2007, with a minimum guaranteed contract amount payable to Nottingham of $1,047,000.00. Although neither party performed pursuant to the Program Management Agreement, Amitech paid Nottingham the $409,000.00 referenced in the letter and Nottingham cancelled its lien.
[4] Notwithstanding a 1915(B) designation, we note that nothing precludes a party from seeking a supervisory writ if the circumstances dictate. See LSA-C.C.P. art. 2201.
[5] Pursuant to Amitech's operating agreement, however, any significant undertaking required the approval of a majority of Amitech's four managers. Although written resolutions signed by the managers were generally used to approve company undertakings outside of formal board meetings, the record contains no resolution or other writing reflecting that the Board authorized Cormier to settle the dispute.
[6] Nevertheless, because we find that no putative mandate existed, agency by estoppel cannot be applied herein.
[7] As a result of the purported settlement agreement, Nottingham contends that it cancelled its lien and lost the security afforded by the lien up to the amount of $2,700,000.00. However, Hicks also acknowledged that after Nottingham discovered Amitech would not honor the purported settlement agreement, Nottingham secured a new lien.
[8] In light of our rulings with regard to assignments of error numbers 1 and 2, Nottingham's third assignment of error is also without merit.
[9] VANED, L.L.C. was an unformed limited liability company to be owned in equal membership units by Vanek and Hicks.
[10] CSRS, Inc. was an engineering firm hired by Nottingham to assist with the project. (R. 3072)
[11] With regard to witness credibility, we note that the trial court made a specific factual finding that Cormier and Shackelford were the most credible witnesses. (R.2036)
[12] Specifically, Amitech contends that the following should have been included within the scope of the Design-Build Contract:

Sound proofing, air locks, sump pumps, pavement additions and catch basins, to suppress noise, dust, and channel wastewater ($61,286.00)
Construction of a control room in the Meyer building ($69,200.00)
Construction of a foreman's office and restroom facilities in the Meyer Building ($85,626.00)
Build a limestone parking lot in front of the administration building as depicted on the Nottingham's site plan ($32,700.00)
Design and construction of a gravel pit for the Meyer plant ($208,65.00)
Delivery of basic electrical infrastructure to the Meyer building ($206,399.82)
Connect power to heating units in both Flowtite and Meyer buildings ($17,020.92)
Amitech also contends that it should be reimbursed for the following corrective work and/or work necessary to meet requisite standards:
Additional work required to bring the buildings up to code ($30,700.00)
Redesigning infrastructure items that failed to operate properly or not sufficient to meet the buildings' demands ($81,184.00)
Alterations to Meyer Building foundations because the existing foundation could not handle process equipment load ($47,250.00)
Corrective electrical work due in part to sub-grade wiring ($42,183.00)
Amitech also seeks reimbursement of $166,05057 for the time and material billings, including overtime, from the contractors used for the referenced work.
[13] Despite denying the referenced claims, we note that the trial court found that other items were recoverable by Amitech. These awards were not appealed by Nottingham.
[14] We note that parol evidence as to what the parties to a contract may have said is not admissible for purpose of proving an antecedent or contemporaneous agreement contrary to that which was reduced to writing. See LSA-C.C. art. 1848 and Southern Fleet Leasing Corp. v. Brown, 257 So.2d 819, 821-22 (La.App. 1 Cir.1972). Amitech offered no contemporaneous objection to the admission of the parol evidence. Therefore, the parol evidence was properly admitted into the record. See Wade v. Joffrion, 387 So.2d 1265, 1266 (La.App. 1 Cir. 1980), Moreover, Amitech has not raised this issue on appeal.
[15] Amitech rejected this change order.
[16] Notwithstanding Amitech's argument, we note that no contemporaneous objection was made with regard to the parol evidence being admitted. See FN 14.
[17] A contract may be modified by subsequent mutual consent.
[18] It is unclear whether the 22,000 cubic yards consisted of loose or compacted fill. Because the unit price charged by Nottingham was based on loose fill, we have utilized that cubic yard measure to determine the credit owed.
[19] On appeal, no party has alleged that the $440,000.00 early completion sum referenced in the March 13, 2003 letter has not been paid.